JOHNSON et al. v. NATIONAL CASUALTY CO. et al.

No. 1726.

Court of Appeal of Louisiana. First Circuit.

Oct. 5, 1937.

236

W. C. Perrault, of Opelousas, for appellants.

Lewis & Lewis, of Opelousas, for appellees.

Le BLANC, Judge.

Horace Johnson, young negro boy, fifteen years of age, son of Ignace and Louisa Johnson met his death on Saturday, August 24, 1935, under the following circumstances:

He lived with his parents, in the country, about seven miles east of the city of Opelousas, in the parish of St. Landry. On the afternoon of August 24, 1935, he had ridden to Opelousas on his bicycle and there took in some of the attractions afforded the people of his race in a city of that size. He left a dance hall at about 11:30 and started out for home on his bicycle. His route took him to the blacktop highway leading from Opelousas to the town of Port Barre. He was well beyond the city limits of Opelousas, when, in some manner which is a controverted point in the case, he became a passenger on a truck belonging to Mr. and Mrs. Simon Stelly, who operated a dairy business under the name of "Rose Dairy" in the same vicinity in which he resided. The driver of the truck was a negro named Leo Reed, employed by Mr. and Mrs. Stelly in their dairy business. Morris Johnson, brother of the deceased boy, who also worked for the Stellys, was with Reed in the truck. The owners of the truck carried public liability insurance with the National Casualty Company.

When he boarded the truck, Horace Johnson placed his bicycle on the running board on the right-hand side, and held it steady from his place on the right-hand side of the driver's seat.

They had gone about four miles on the highway and were at a point where there was an intersecting road when the truck crashed into a horse drawn wagon in which was a party of young people returning home from a dance. The wagon was not on the intersecting road but was coming on the same highway as the truck, from the opposite direction in which the truck was traveling. The force of the impact was so great that the wagon shaft or pole pierced the right front door of the cab of the truck, next to which the deceased boy was sitting, and struck him in the stomach, causing internal injuries from which he died about thirty minutes after.

His parents have instituted this suit seeking to recover damages in the sum of $3,750, each. The suit is directed against Mr. and Mrs. Simon Stelly, the National Casualty Company, and Leo Reed. The last-named defendant is charged with extreme negligence in operating the truck by having failed to maintain a proper lookout and to keep it under such control as to be able to stop or properly manipulate it within the range of vision afforded by the headlights, which were burning at the time. Mr. and Mrs. Stelly are sought

to be held liable under the doctrine of respondeat superior as it is alleged that Reed, the driver of the truck, was, at the time, acting within the scope of his employment by them in the conduct of their dairy business. The National Casualty Company is sued as the public liability insurance carrier on a policy of insurance covering the truck involved in the accident.

It is shown that shortly after the death of their son the plaintiffs had signed a document intended as a release in favor of the named defendants, but in their petition the same is attacked on the ground that their signature thereto had been obtained through misrepresentations, fraud, and deceit, and without any valid consideration, and also that the draft in the sum of $50 which they had received from the defendant insurance company under the terms of the said document was never indorsed or cashed by them after they had learned the true significance of what was being perpetrated on them and had ascertained their real rights in connection with his death. They had offered to return the draft to the insurance company but the same was refused; so they annexed it to their petition and thus tendered its return to the insurance company.

The issues raised by the pleadings submitted on behalf of all defendants may be said to be the following: (1) On the part of them all, the plea that the deceased was a trespasser at the time of the accident and was riding on the truck at his own risk. (2) A denial of the negligence charged against the driver of the truck, by all defendants, and, in the alternative, a plea of contributory negligence against the deceased. (3) On behalf of Mr. and Mrs. Simon Stelly and the defendant insurance company, the validity of the release executed by the plaintiffs under which they claim to be relieved of further liability, and on behalf of Mr. and Mrs. Stelly, the plea that they cannot be held liable under the plea of respondeat superior for the reason that the driver of the truck, Leo Reed, had been given positive instructions against permitting any one to ride on the truck which itself was equipped with a "No Riders" warning sign, and all of this to the knowledge of the deceased himself. Further, on behalf of Mrs. Stelly, the plea that if there should be any liability on their part that there can be no separate judgment rendered against her but one only against the community between them as

the dairy business in which they were engaged was not her separate enterprise but one operated with community funds. (4) On behalf of the insurance company, a plea that it cannot be held under the policy as it contained a provision to the effect that the coverage afforded under a special paragraph, which is invoked, did not apply unless the injured party riding in the truck was so riding with the permission of the assured, which of course the deceased boy was not doing at the time of the accident.

With the issues as thus made, the case went to trial before the district judge whose term of office was to expire within a rather short period thereafter. He rendered judgment in favor of the defendants, dismissing the plaintiffs' suit at their costs. His successor in office qualified within the delay fixed by law for applying for a new trial. The application was timely presented and a new trial granted. The case was then resubmitted to the presiding district judge on the record as made and resulted in a judgment in favor of the plaintiffs in the sum of $2,500 each, as against the defendants Leo Reed and the National Casualty Company, in solido, and a dismissal of the suit as against the other defendants Mr. and Mrs. Simon Stelly. Appeals, both suspensive and devolutive, were granted to the two defendants cast by the judgment. The National Casualty Company perfected the suspensive appeal, Leo Reed took only the devolutive. The plaintiffs did not appeal from that part of the judgment which dismissed their suit as against Mr. and Mrs. Simon Stelly, neither did they answer the appeal taken by the two other defendants. We are therefore not concerned with any of the issues presented by their answers.

We will take up first the question of the validity, vel non, of the document executed by the plaintiffs, which the defendants contend constitutes a full release from liability in as much as a draft for the amount therein specified, to wit, the sum of $50, was delivered to the plaintiffs.

The circumstances under which the document was signed by these two illiterate negroes do not leave us with a favorable impression regarding its validity as a binding contract. The defendant insurance company's sole object, of course, was to obtain and have executed a contract of compromise and settlement, under which

the plaintiffs were to accept a certain sum in full settlement and payment of any and all claims they may have against it and the insured under the policy issued by it, arising out of the death of their son. When we read the document itself, however, we find that it does not state that at all. The document, styled a "Release," begins by reciting that "Whereas, the undersigned (the two plaintiffs) was injured and his property damaged on or about the 24th., day of August, 1935, under circumstances claimed to render" the defendants liable in damages, etc., and it then goes on to state the consideration for the compromise stipulated as being the sum of $50, "the receipt of which is hereby acknowledged," and for which they forever discharge the insurance company and the insured from any claims, cause of action or demand they may have "by reason of said injuries and damage to property; or by reason of any cause, matter or thing whatever prior to the date hereof." The last-quoted clause, we think, is not sufficient of itself to convey the idea that it was the intention of the parties to release any one from liability for damages resulting from the death of their son, especially when no mention whatever is made of any such damages. There is considerable testimony to the effect that when they were first approached, they were asked what expenses they had been put to, and, as the funeral expenses had been $53, they may well have been led to believe that that was what they were being paid the $50 for.

Moreover, there appears to have been another document executed on the same day, August 30, 1935, which was six days after the death of their son, and which is styled "Release of Minor and Guardian." This document is signed by Morris Johnson, brother of the deceased boy, and who, it is remembered, was in the truck at the time of the accident. It bears evidence, according to its recitals, that he was also to receive the sum of $50 in full settlement of any and all claims he might have against the insurance company and the insured, arising out of the accident. The approval of his father and mother to the settlement is annexed to the document and signed by them. In view of the testimony of the claim adjuster of the insurance company that the sum of $50 was to cover both cases, and as a matter of fact that there was but one draft of $50 issued, it is rather hard to understand the necessity for this additional release, in the form in which it was made.

Viewed in the light of its own terms, the purported release executed by the plaintiffs seems to be far from complete as a contract of compromise such as it was intended to be. As shown by the note of testimony, there was much left to be explained by parol proof. In Lampkins v. Vicksburg, S. & P. R. R. Co., 42 La. Ann. 997, 8 So. 530, 531, our Supreme Court stated that the contract of compromise is null if it is imperfect and misunderstood. "To be valid as a transaction, this contract must be complete in itself, and nothing left to be established by parol proof."

The testimony shows that it was 9:30 at night when the adjuster of the insurance company called on the plaintiffs to have them execute the document. They had already retired for the night. As previously stated, they are illiterate negroes who speak French and understand English with difficulty. They signed this document only a few days after the death of their son, and no doubt were still undergoing the sorrow and grief occasioned thereby. All of this, taken into consideration with the form in which we find the document, indicates the haste and perhaps also the anxiety of the adjuster in obtaining the release. We doubt seriously that there was a full and complete understanding by these plaintiffs of its full import, and agree with the district judge in his ruling which set it aside.

We take up next the question concerning the status of the deceased boy on the truck on the night of the accident. Was he a trespasser, as contended by defendants, or was he a guest or invitee? There are but two witnesses whose testimony has any direct bearing on this question: One, the driver of the truck, Leo Reed; the other, Morris Johnson, brother of the decedent who was also aboard the truck. If Reed's testimony be accepted, there can be no doubt but that the boy was a trespasser. If Morris Johnson's account of how he got on is correct, then he was a welcome guest. We are inclined to believe that neither of these witnesses stated the fact exactly as it happened. According to Reed, the young boy practically forced his way on, and Johnson, on the other hand, says that Reed assisted him in placing his brother's bicycle on the running board and that he held it until the

boy could adjust himself· in his ˙seat .on the truck and hold it himself.

Reed's version strikes us as being highly improbable, as we do not think this young boy could have forced his way, with the bicycle arranged as it was, on that truck. In considering his testimony on this particular point, we must bear in mind his knowledge of his employer's attitude regarding the matter of permitting riders on the truck, and it may well be that his testimony was motivated by a desire to clear himself of any suspicion that he had violated his master's positive instructions. He may not have gone as˙ far as Morris Johnson says he did in assisting the boy, but, at any rate, we are convinced that he did permit him to get on the truck with his bicycle, and, if the actual relation of driver and invited guest did not come into existence, at least the boy was an invitee by sufferance to whom the driver owed the same· duty of care as to a guest.

■ On the question of Reed's negligence, little need be said, as his own testimony as to how he came to run into the wagon is very vague and the physical facts demonstrate positively; as testified to by the other witnesses, that he left his side of the road on the right and drove over to the left and ran into the wagon. The occupants of the wagon held a burning lantern in the front which gave sufficient warning of its presence on the highway. The force of the impact and the accompanying results which have already been described must surely discredit his statement that he .was proceeding· at a slow and ·cautious rate of speed. We have no doubt that it was his failure to keep a proper lookout and have his car under proper control to stop it within a reasonable distance at night that was the cause of the accident.

■■ We do not think that the defendants have sustained their plea of contributory negligence urged against the deceased boy. Reed himself says that he veered to ˙the left of the road twenty-five feet before he ran into the wagon. Certainly in that short distance the.boy did not have time to apprehend the danger which was so imminent and warn the driver in an effort to avoid it. In numerous decisions, this court has held that the guest riding in an automobile has the right to rely to a reasonable extent on the care of the driver and his proper management of the car, and in Delaune v. Breaux, 174 La. 43, 139 So. 753,

the Supreme Court held ·that the duty did not devolve upon him to keep a lookout for any sudden emergency which may arise. Under that ruling, the present plea of contributory negligence was properly overruled.

■ This takes us to the last issue in the case, one of the most seriously controverted on the part of the defendant insurance company. The contention made is that the truck driver's violation of the positive instructions of his insured employer against permitting riders discharges it from liability under the policy under the terms of the following clause which it contains: "If the stated and actual use of the automobiles covered by this policy is 'pleasure and business' or 'commercial' any person or persons while riding in or operating any of such automobiles and any person, firm or corporation responsible for the operation thereof, shall be considered as an additional assured under this policy. The coverage afforded by this paragraph shall not apply unless the riding, use or operation above referred to be with the permission of the assured named in the schedule of this policy, or. * * *"

The assured named in the schedule of the policy is "Mrs. Simon Stelly, operating as 'Rose Dairy' and the business of the assured is said·to be 'Dairy.'" The purpose for which the motor vehicle insured is to be used is said to be ."Commercial, such as is usual to the Dairy Business of the Assured." These specifications can leave no doubt but that the truck was insured to be operated in pursuance of the dairy business and that the protection afforded to others than the owner of the truck and his family extended to those only who, at the time of the damage occasioned thereby, were operating. the truck in connection with that business. That is made clear by the definition given in the policy to the term "commercial." It is therein defined "as the transportation or delivery and the loading and unloading of goods or merchandise and other business purposes in direct connection with the Assured's business occupation, as stated in the Schedule"; and, as if to extend the definition, it is made to include "pleasure·use" of the vehicle "for the named Assured's family."

■ There can be no serious dispute on the point that when Leo Reed left Opelousas the night of the accident, he was operating the truck for "commercial" purposes within the terms of the policy. Not only

was he returning the truck to the dairy from a business trip to Opelousas that afternoon where it had been driven by a Mr. Quebodeaux, who was employed by the Stellys and who resided in Opelousas, and was not to return to the dairy himself, but it is shown that Reed was to pick up the empty milk bottles on the way back. The insurance company itself came near, if it did not actually concede as much, when it apparently recognized its liability to the occupants of the wagon and its owner and settled with them for the damages they had sustained. We are convinced that Leo Reed was "a person * * * responsible for the operation" of the truck on that night, coming under the provisions of the first herein quoted clause of the policy, and, as such, "an additional assured" under its further provisions. The pertinent question is not whether the deceased boy who was riding on the truck without the permission of the named assured in the policy was an addditional assured or not, but whether the driver of the truck, at the moment of the accident, was such an assured whose negligence was covered by the terms of the policy. As already stated, we are satisfied that he was and we are further of the opinion that his mere act in stopping the truck to pick up the boy did not have the effect of changing his status as such. It was not such a deviation from his course of employment as to convert the use of the truck from "commercial" to "pleasure." Even were it to be conceded that momentarily his act did operate as a deviation, certainly during the three or four miles that he drove the truck again before the moment of the accident he had resumed the status of a person responsible for its operation and as such covered as an additional assured under the terms of the policy.

But it is urged that in permitting the boy to ride on the truck the driver did something which he had been expressly forbidden to do by his employer, the named assured in the policy, and that, consequently, under the provisions of the policy, the insurer is relieved of any liability. Such violation of instructions given him, by the driver, might very well relieve the employer, as indeed it has in this very case, but we don't see how it could affect the liability of the insurer which had insured him as well as the employer. If permission of the assured named in the policy was necessary to make him an additional assured, certainly such permission is to be implied from the very fact that he was operating the truck in the service of the named assured who was his employer.

Counsel for the defendant insurance company have referred us to numerous decisions of courts of other states which they claim support their contentions. A number of them appear to us to have but little, if any, bearing on the question involved. In Rhodes v. Ocean Accident Guarantee Corp., 239 App.Div. 92, 266 N.Y.S. 681, on which they particularly seem to rely, there is a distinguishing feature. There, the injured party was attempting to recover as an assured herself under the policy which contained the same restriction regarding persons riding without permission of the named assured. In this case, as already stated, recovery is not sought on the ground that the deceased boy was an assured under the policy, but on the ground that he was injured through the negligent operation of the truck by Leo Reed, who was specifically an additional assured thereunder. In the case of Utica Mutual Insurance Company v. Langevin, 87 N.H. 267, 177 A. 549, 550, we have a case which passes more directly than any other we have been able to find, on the point at issue. From the statement made by the court, the facts are practically the same as those before us and the provisions of the insurance policy seem to be substantially alike. The injured passenger aboard the truck, who was riding without the owner's consent as a guest of the employee who was driving, sued the employee on a claim for his negligent operation of the truck. The lower court ruled that the policy of insurance carried on the truck insured the employee's liability to the injured passenger, and on appeal the ruling was sustained. It was the contention of the insurance company, the same as in the present case, "That although driving the truck within his employment, the employee was making an unpermitted use of it in carrying Langevin as a passenger, and that therefore the liability for injuring him was uninsured." It was urged that the non-liability of the employer relieved the insurer. "This does not follow" said the court in the opinion handed down, and in assigning reasons stated:

"The issue is of the extent of the insurance the employee received. He may be insured, the same as a bailee not in the employer's service, for a liability for conduct not chargeable to the employer. The employer's liability for the employee's fault is the test of the insurer's only if the policy so reads.

"The predominant purpose of the policy, as to the employee, is to insure him for all his liability in the use and operation of the truck within the course of service the policy covers. His insurance is not measured by that of the employer but is independent of it, if he is using the truck within the coverage. There was bought a policy to insure all his liability while using and operating the truck with the employer's consent and for a purpose the policy authorized. * * *

"The employee's possession of the truck was rightful, he was using it in the employer's business, and his operation of it was within his service. While he had no right to invite others to ride, likewise he had no right to operate the truck negligently. Carrying passengers and negligent operation were both unauthorized. If the carrying was without, and the negligence within, the scope of the employment, the policy does not make the difference a test of insurance.

"The dual status of the employee in acting at the same time within and without the promotion of his employer's business may be assumed * * * but the question here is not of the validity of the distinction. It is, instead, whether the policy makes the distinction. Nothing is found thus to construe the policy. On the contrary, its purpose to give the unnamed insured as much insurance as the named assured has seems unmistakable. * * *

"If there is at the same time both an authorized and unauthorized use, the policy protects for liability arising from the latter as much as from the former use."

The reasoning applies with great force in the case before us, in which the same contention is made by the insurance company. It strikes us as being sound and logical and it properly disposes of this last issue in the case.

On the question of the amount of damages, we note that the award made to each parent is the same as was made to only one parent for the death of an eleven year old girl in the case of Guillory v. Horecky, 185 La. 21, 168 So. 481. This is a recent decision of the Supreme Court and may well be used as a basis for the award to be made in the present case.

For the reasons herein assigned it is ordered that the judgment appealed from be affirmed at the costs of the appellants.