JANVIER, Judge.
Anthony Taormina sustained physical injuries when the automobile in which he was riding and which was driven by Frank Timphony collided with a truck which was ■ being driven by Tot Réid and was going in the opposite direction. Alleging that the accident- had been caused by the joint negligence of Timphony and Reid, Taormina brought this suit.- against both and also against Iowa Mutual Casualty Company, which corporation was the liability ‘ insurance carrier,of Timphony.
The said insurance company answered, admitting the occurrence of the accident, but averring that Timphony had not been in any way at fault, and in the alternative, alleged that if it should appear that there -had been any ■ negligence on the part of Timphony, Taormina himself had ■ been guilty of contributory negligence “in riding with defendant - without making any protest whatsoever, or making any endeavor to cause defendant to moderate his speed.”
Reid answered, in effect admitting the occurrence, but denying that he had been in any way negligent, and in the alternative averring that Taormina had been giiilty of contributory negligence - in that both Taormina and Timphony “failed to keep a proper lookout for traffic on the -highway, were driving at racing speed,” and that *353 the car in which Taormina was riding “was going too fast for the type of highway or the ability of the driver to control same,” and that “therefore both plaintiff and driver are guilty of utter disregard for the safety of your defendant and other users of the highway. ,
Timphony was never served with citation and filed no answer.
The record shows that Timphony filed another suit for damages against Reid and that that suit, by agreement of all counsel, was consolidated with the suit which we are now considering “for the purpose of taking testimony.”
The judgment before us was rendered in the suit against Timphony, Reid and Iowa Mutual Casualty Company and that judgment dismisses the suit of Taormina as against all three of the said defendants.
The record shows that Timphony and Taormina, with Timphony at the wheel of his car and Taormina on the front seat alongside him, were on their way to Delacroix Island which is situated some distance below the City of New Orleans, and that their purpose was to permit Timphony to examine a boat which he was thinking of buying. They were on that part of the road which lies alongside Bayou Terre Aux Boeuf when they approached a car which had been going in the opposite direction but which had been stopped for repairs. This car was parked on the other side of the highway, but it was not completely on the shoulder since its left side extended over the edge of the paved portion for a distance of about two or three feet. The truck of Reid was some distance beyond this stationary car and was going in the opposite direction to that in which the Tim-phony car was traveling, so that its path was partially blocked by the stationary car. The Reid truck reached the stationary car just before the Timphony car and since it had been swerved slightly to its left in order that it might pass around the stationary car, its left side was about two or three feet on the left or wrong side of the center line of the roadway. Just after it had passed the stationary car, there occurred the collision on which this suit is based.
The Buick had been swerved to its right, which was towards Bayou Terre Aux Boeufs, in an effprt of Tirppho.ny to avoid the collision, and, after the impact, it proceeded into Bayou Terre Aux Boeufs and was partially submerged in the waters of the Bayou. Taormina and Timphony both escaped, but Taormina sustained the injuries on which he bases this claim. ■
Necessarily there was fault on the part of at least one of the drivers and each insists that the fault lay with the other. And both say that if there was fault on the part of either, Taormina was himself at fault in not warning Timphony of the danger which was apparent.
Taormina says that the Timphony car was running at a speed of from 40 to SO miles an hour and that he saw the parked car, which partially blocked the other side of the road when that car was about two blocks away from the Timphony car. He says that he also noticed the Reid truck coming towards them and that it was about two blocks beyond the parked car.
Timphony says that he saw the stationary car when it was about 300 feet ahead of him and that it was partially on the other side of the road and that the Reid truck at that time was about 200 feet beyond the stationary car coming toward it and running at a speed of from 50 to 60 miles per hour.
Reid, who was driving the truck, says that he saw the parked car when it was about 300 feet ahead of him, that it was partially in his' lane and that he did not notice the Timphony car until he reached a point somewhat closer to the stationary car and that then he “saw it coming at a terrific speed.” He says that at that time the Timphony car was about two blocks away from his truck and that Timphony’s car, “was making anywhere around 60 or 65”.. Reid says that at that time his truck was running at a speed of about 35 miles per hour. The collision occurred just after the truck had passed The parked car.
*354 Charlie Drew was a passenger in the Reid truck. He says that he saw the parked car when it was about 500 feet ahead of them and that when the Reid truck reached a point about 150 feet from the stationary car, the Timphony car was about 200 feet on the other side of the parked car and was “traveling a little faster than the truck was.” He says that when the Reid truck reached a point about 30 feet away from the stationary car, it was brought “almost to a stop,” but he added that, as the truck reached the parked car, it “came out just about two feet over * * * the center of the road.’* While there is some contradictory testimony as to whether or not the road at that point is straight, we have no difficulty in concluding that it was sufficiently straight for the occupants of each of the vehicles to see the other vehicle when the two were at least 500 or 600 feet apart and, that' such slight curve as there may have been played no part in the ensuing accident..
Nor do we have any difficulty in reaching the conclusion that both drivers were at fault and that either could have avoided the accident by reducing speed sufficiently to permit the stopping of his car as sóon as it became apparent that the other was determined to be the first to pass through the narrow portion of the roadway between the parked car and the other side of the black-topped road.
The record leaves us convinced that Ta-ormina was correct when, in his testimony in referring to Reid, he said:
“ * * * then he tried to squeeze through, and his. right — his right fend- . er and bumper hit the left-hand side of the car.”
Surely Reid, whose path was partially blocked by this stationary car, should have made certain that it was perfectly safe for him to drive his truck on the wrong side of the road before attempting to do so.
In LSA-R.S. 32:232 it is provided that:
• “Drivers of vehicles proceeding in opposite directions shall pass each other to the right, each giving the other for at least two hundred feet before meeting, one half of the main travelled portion of the highway.”
In Waguespack v. Savarese, La.App., 13 So.2d 726, 730, we quoted from Mr. Blash-field’s Cyclopedia of Automobile Law and Practice, Vol. 2, .Perm.Ed., sec. 919, p. 60, and now repeat a. part of what Mr. Blash-field has to say on the subj ect:
“A driver, therefore, proceeding on the right side of the traveled -way, may assume that the driver of a vehicle ap.proaching on the same, side, or on his left hand side, will do all that a reasonably prudent person, under all the circumstances, would do to avoid a collision, which ordinarily would be to yield half the way or to turn out in time to avoid a collision, and that such driver will not force him, in violation of the statute or ordinance, or the law of the road, to turn from the part of the road on which he is lawfully driving.”
The record shows that after the occurrence Reid and others were taken to the office or home of Wilfred Haydel, Justice bf the Peace, and that there Reid signed a statement written 'by Haydel in which he admitted responsibility for the accident. We do not find the statement in the record and we have no knowledge of its exact wording. Counsel for Reid attempted to show that the statement had been signed under duress resulting from the fact that both a deputy sheriff and the Justice of the Peace were present and that Reid believed that he would be taken to jail if he did not sign the statement.
Although Reid says that he reduced the speed of his truck to about 35 miles an hour and had practically stopped when he passed the stationary car, it seems quite certain that he did not do so and that he attempted to dash around the parked car and regain his position on.the proper side of the road-before the Timphony car could pass.
Not only is the speed of the Reid truck evidenced by testimony, but it.is indicated by the fact that when the collision occur *355 red it had turned partially sideways as a result of the sudden application of its brakes.
On the other hand, had. Timphony reduced his speed he could have avoided the accident for he could then have stopped his car as soon as it became apparent that Reid was not going to accord to him the right to continue past the parked car. And that Reid did not intend to.stop and allow Tim-phony to pass first is evidenced by the fact that the collision took place just after .the Reid car had passed the stationary car.
The only question which causes serious concern is whether or not Taormina was contributorily negligent in failing to warn Timphony of the danger. Very seldom is a passenger in an automobile justified in interfering with or advising the driver of the car as t'o what to do or as to how to avoid an impending accident. Ordinarily if the passenger knows that the driver is competent and experienced and is sober and seems to he aware of what is going on on the highway ahead of him, he should not attempt to interfere in the operation of the car and should not attempt to confuse the driver by advising him as to what to do. While it is true that Taormina says that he did not know whether Timphony saw the approaching truck as soon as he himself saw it, he says that he had no reason to believe that there was going to be an accident until just before it occurred. Until the cars were quite close together either could have stopped or reduced speed sufficiently to permit the other to pass and Taormina was justified in believing that either or both would do so. He says that he saw no reason to give warning until at the last moment he realized that neither was going to stop and he says that then, “when I saw it, I just froze.” He added that not more than five seconds elapsed between the time at which the danger became apparent and the occurrence of the accident.
“The automobile was midway between us. So as' we kept on going, I watched the truck an'd I watched' the automobile, just looking, as if everything was going to be routine,-and then just about four or- five seconds before this happened I happened to look at Mr. Timphony, and I looked at the car— well, just to say you check on something, you know, check on something to ■ kind of keep myself straight, and then, just like that, that accident happened; about four or five seconds.”
Iii Malone v. Hughes, 65 So.2d 665, 669, the Court of Appeal for the First Circuit, said-: -
“As to the time element, using the greatest distance of .500 feet, considering the fact that the brakes on the Malone • automobile took effect approximately 150 feet before the collision, and allowing for the usual reaction time at the established speed of the Vehicle, it is obvious that the plaintiff, Bessie Malone, could have had at most only a period of approximately seconds in which to observe-and evaluate the danger and give warning to the driver even if she had been alert, vigilant and observing far beyond the degree required. To convict her of negligence on this basis, in our opinion, would be utterly unreasonable.”
In Herget v. Saucier, 223 La. 938, 67 So.2d 543, 545, the Supreme Court said:
“Generally, a guest passenger is not required to keep a constant lookout for the dangers of the highway, or to pay attention to the ordinary road and other traffic conditions incident to automobile driving, it being his right and privilege to place reasonable reliance upon the driver in charge of the car for the exercise of the necessary care and caution. * * * ”
The Court recognized the fact that there may be occasions on which the passenger may give warning, saying with reference to the passenger:
“ * * * Of course, if he is aware of a danger ahead which apparently is unknown tó the driver, or if he observes that such driver is incompetent *356 or otherwise unfit to operate the machine, a duty devolves upon him to take some precautionary action. * * * ”
It is argued on behalf of the defendants that if Timphony was guilty of negligence, it necessarily follows .that Taormina was also negligent in not warning Timphony. This does not necessarily follow. It may often happen that a guest passenger is not at fault where the driver of the car in which he is riding ■ is obviously guilty of. negligence. In Albright v. Tatum, La.App., 37 So.2d 888, 895, Mr. Justice LeBlanc, now of the Supreme Court, then Judge of the Court of Appeal for the First Circuit, said:
“He (the guest) is not called on to be on the same alert and to have seen what the driver should have seen. It is only where there is danger so apparent that he, as well as the driver, should have seen it, that he becomes, negligent also if he fails to give warning or to protest if the driver’s negligence continues. * * * >>
In Johnson v. National Casualty Co., 176 So. 235, 239, the Court of Appeal for the First Circuit said:
“In numerous decisions, this court has held that the guest riding in an automobile has the right to rely to a reasonable extent on the care of the driver and his proper management of the car, and in Delaune v. Breaux, 174 La. 43, 139 So. 753, the Supreme Court held that the duty did not. devolve upon him to keep a lookout for any sudden emergency which may arise. * * * ”
Our conclusion is that it cannot be said that Taormina was at fault in not interfering with the operation of the car in which he was riding and that he was justified in not warning Timphony when the cars were so far apart that care on the part of either driver could have avoided the collision.
It necessarily follows that Reid and. the Iowa Mutual Casualty Company are liable for such damage as Taormina sustained.
The record indicates that there might have been some doubt as to whether Timphony also could have been held liable. This doubt which may have originally existed resulted from the fact that Timphony was not cited and did not file answer or other appearance. He did appear in court and was present during the trial, but this presence may have been due to the fact that he was plaintiff in another suit which he had -filed against Reid. However, in the taking of the testimony, Timphony, as a defendant, was represented by counsel who stated that they also represented his insurer. Under the circumstances we think it clear that Timphony who, through counsel, took part in the defense of the suit against him, may also be held liable solidarily with the other defendants.
It is quite evident that plaintiff’s injuries were not particularly serious. After the accident he was taken to Dr. V. D’lngianni who was not called as a witness but whose report, by agreement of counsel, was placed in the record. That report, reads as follows :
“To Whom It May Concern:
“On September 29, 1950 a patient by the name of Anthony Taormina stated that he had been in an automobile accident and sustained injury to his head and multiple contusions of his body.
“Examination of this patient revealed laceration of the forehead involving the hairline. The forehead was cleaned and infiltrated with novocain and cleaned with soap and water and sutured. Seven sutures were used to approximate the skin.
“There was no evidence of bone injury by probing. There was no other apparent severe injuries.
“Patient was given tetanus toxoid and sent home.”
There is also in the record a written statement of Dr. E. F. Salerno who was later called on to treat plaintiff but who *357 did not testify. The written statement of Dr. Salerno reads as follows:
“Above (Anthony Taormina) sustained a traumatic laceration wound upper central area of forehead. Laceration about 2 inches in length-was infected obligating drainage and resutur-ing.”
One month after the accident, apparently at the request of the adjuster for one of the defendants, plaintiff was examined by Drs. Phillips and Harrison. They found that he was able' to move his head and neck “within normal limits and without pain.” The report shows that “there is a healed laceration, approximately 1^. inches in length at the middle of the forehead in the hairline.” They found no other marks of injury from the accident. The report of Drs. Phillips and Harrison concludes with the following statement:
“In our opinion this patient received a contusion and laceration of the forehead, a contusion of the left side of the abdomen, left thigh, left knee and left arm. At the present time there is no residual of his injuries except the tender healed wound of the forehead. We feel that there is no disability at the present time. There will be no permanent disability.”
The accident occurred-on a Friday and plaintiff returned to his work on the following Monday which was the third day after the occurrence, though he did say that he had spent the weekend in bed. The only permanent effect of the accident is the possibility that there may be a scar from the “laceration of the forehead involving the hairline,” though there is no medical or. other testimony to show whether or not such a scar is visible.
We find in the record a bill of Dr. Salerno, one pf the doctors to whom we have already referred. This bill is addressed to (Mrs. A. Taormina and the amount of it is $52.00. Therp is- nothing to show whether it was paid by Taormina or in fact whether it was paid by any one. Taormina says that he did hot pay the bill of Dr. DTngianni, and we think that the record indicates that the bill of Drs. Phillips and Harrison was paid by one of the defendants.
Taormina’s own statement as to the extent of his injuries is as follows:
“The first week it hurt plenty bad, ■ and then the second week I had a few headaches in between .times . * *
He added:
“the third week — this big blood clot bruise on my hip was still bothering because I couldn’t get off my feet. I had to keep working. And the third week I still had this, and the bruises had healed.”
We conclude that $750 will amply compensate plaintiff for such injuries as are indicated by the record and for such expenses as may have been caused.
It is therefore ordered, • adjudged and decreed that the .judgment appealed from be and it is annulled, avoided and reversed and that there now be judgment in favor of plaintiff, Anthony Taormina, in the sum of $750, jointly and solidarily against Frank Timphony, Tot Reid and Iowa -Mutual Casualty Company, with legal interest from judicial demand, defendants to pay all costs.
Reversed.