This is an action in damages for physical injuries sustained by plaintiff as the result of an accident which occurred at about 9:50 p.m., on June 29, 1940, at the intersection of St. Charles Avenue and Clio Streets in the City of New Orleans, in which plaintiff was struck by a taxicab owned by the defendant, White Top Cabs, Inc., and being driven by its employee, John Benjamin. The suit is directed against White Top Cabs, Inc., its liability *Page 69 
insurance carrier, Independent Cab Operators Association, and John Benjamin, against whom solidary judgment is asked for in the sum of $8,615.
Plaintiff alleges that the accident was due entirely to the gross negligence and lack of care of the taxicab driver, Benjamin, and enumerates in detail various acts of omission and commission constituting such negligence and carelessness. Plaintiff further alleges that defendants are in possession of a document which purports to be a release of any right or claim to damages accruing to him as a result of the accident; that he, plaintiff, has no knowledge of said "release" and that the signature appearing thereon, purporting to be his, is a forgery. Plaintiff further charges, in the alternative, that if any "release" exists, the same is a nullity; that his signature, if appearing thereon, was obtained through misrepresentation, fraud and deceit, and while plaintiff was not physically or mentally normal.
Defendants deny all of the material allegations concerning negligence on the part of the operator of the cab, or the owner thereof, and particularly denying that there was any fraud, misrepresentation or deceit involved in the negotiations leading up to the execution of the release or compromise, or in the execution thereof, and they assert that said release is valid and binding. In the alternative, defendants plead contributory negligence on the part of plaintiff in bar of his right of recovery.
The Board of Administrators of the Charity Hospital at New Orleans intervened, alleging certain hospital treatment rendered to plaintiff in the amount of $110, and asserting that it is entitled to recover this sum from plaintiff and defendant solidarily, in the event of a judgment herein in favor of plaintiff.
Before a trial was had on the merits, defendants interposed pleas of estoppel and res adjudicata and also an exception of no right or cause of action. All of these pleas were incorporated in one document and are based upon the asserted validity of the written release in that the sum of $10 was the consideration paid plaintiff by way of compromise of any claim he may have had against the defendants, and that, therefore, he is estopped to claim any further sum, the compromise having the effect of res adjudicata, unless the same should be set aside, and that plaintiff having failed to allege that the amount received as a result of the compromise has been returned, or that a proper and timely tender thereof has been made to defendants, no cause of action is stated.
These pleas and exception were heard by the trial court and referred to the merits. The case was tried and there was judgment dismissing plaintiff's suit, from which he has appealed. We find in the record no appeal by the Board of Administrators of the Charity Hospital.
The record discloses that plaintiff, Erling Lervick, is a Norwegian citizen, who was periodically employed as a chief engineer on boats plying between United States, South American and European ports. Under federal laws and regulations his stay in this country was limited to sixty-day periods.
On the night of the accident the plaintiff was walking across St. Charles Avenue, and, as he was in the act of crossing that avenue, at the intersection of Clio Street, he was struck by defendant's taxicab and injured. St. Charles Avenue is a wide and heavily-traveled thoroughfare, with a neutral ground in the center and a paved vehicular roadway, thirty-six feet wide, on each side. Plaintiff had negotiated the river side roadway and the neutral ground and was struck when in the lake side roadway. There can be no dispute that the accident occurred in the middle of this roadway.
It is shown that there is a semaphore traffic light at the intersection of St. Charles Avenue and Calliope Street, one block below the Clio Street intersection. The taxicab of defendant was proceeding on the lake side roadway of the avenue, moving in the direction of uptown. On reaching the Calliope Street intersection the taxicab was stopped to await a favorable traffic light. According to the testimony of the taxicab driver, immediately upon being thus favored he started up St. Charles Avenue, driving at a speed of about twenty miles per hour and about four or five feet from the neutral ground curb. There were no cars ahead of the taxicab and, as testified to by the driver, an automobile was traveling directly on his right and another to his right also, but slightly to the rear. The car abreast is shown to have quickly passed the taxicab and speeded up the avenue, though it is conceded that Benjamin's vision ahead was not impeded.
Benjamin further testifies that when he reached the middle of the block between *Page 70 
Calliope and Clio Streets, he saw plaintiff step down from the neutral ground curb and proceed across the lake side roadway; that he then sounded his horn, but did not reduce his speed; that when plaintiff reached the middle of the roadway he, plaintiff, seemingly became confused, stopped, turned around, and then attempted to return to the neutral ground. It was then, as Benjamin testifies, that he reduced the speed of the cab to fifteen miles per hour and again sounded his horn; that, when plaintiff became seemingly confused and reversed his course, the taxicab was then about twenty to twenty-five feet from plaintiff; that the driver then applied his brakes in an effort to stop and avoid running into plaintiff, but to no avail, and the right front part of the bumper and right front fender struck plaintiff, throwing him to the pavement and causing the injuries complained of.
Plaintiff's testimony is that, before stepping off the neutral ground curb into the lake side roadway, he looked in the direction of approaching traffic; that he saw an automobile about three-quarters of a block away, and, believing that he could safely negotiate the crossing, started across the roadway; that while crossing he again looked for approaching cars, and, when he had traversed one-half of the width of the roadway, he saw the taxicab approaching at a fast rate of speed, bearing down on him, and the impulse of the moment caused him to stop, face the approaching taxicab, and raise his arm signalling his presence, believing that to be the safer course and one which would permit the taxicab to be driven past him on either side of the roadway. He further testifies that he was struck down and rendered semi-conscious, having no recollection of any subsequent occurrence until he arrived at the hospital.
Article V, section 2 (a) of the Traffic Ordinance of the City of New Orleans, No. 13,702 C.C.S., reads as follows:
"2. Reckless Driving. Any person who drives any vehicle upon a highway carelessly and heedlessly in disregard of the rights or safety of others, or without due caution and circumspection, and at a speed or in a manner so as to endanger or be likely to endanger any person or property, shall be guilty of reckless driving."
The evidence conclusively establishes that Benjamin, the driver of the taxicab, was negligent and heedlessly disregarded the rights and safety of others. The lights of his taxicab afforded clear vision ahead and there was no obstacle or obstruction of any character to interfere with his view. He was about in the middle of the block, or 150 feet or more from the intersection, as the record amply demonstrates, when he first saw plaintiff step from the neutral ground and proceed to walk across the roadway. He then sounded his horn, but apparently did not sufficiently reduce his speed, or place his taxicab under such control as the circumstances demanded. His only effort to avoid the accident was made at the time he noticed plaintiff's dilemma, when he was about twenty feet away. The application of his brakes at that moment was much too late to avoid striking the plaintiff.
When Benjamin saw plaintiff enter the roadway 150 feet or more ahead of him, he should then have appreciated the danger, reduced his speed and placed his taxicab under such control as would permit plaintiff to complete the crossing in safety. The law requires the exercise of extraordinary care on approaching an intersection used by pedestrians in crossing the street, and more particularly when one is seen at a safe distance ahead in the act of crossing. In the latter instance, having discerned the dangerous condition prevailing, Benjamin might easily have avoided the accident by the use of ordinary care and caution.
Plaintiff, on the other hand, having entered the intersection with approaching traffic a safe distance away, had the right of way. Article IV, section 2 (a) of the traffic ordinance (supra), reads as follows:
"Pedestrians' Right of Way. (a) The operator of any vehicle shall yield the right of way to a pedestrian crossing the roadway within any marked crosswalk, or within any unmarked crosswalk at an intersection, provided the pedestrian has started across the street before the vehicle shall have entered the intersection, except at intersections where the movement of traffic is being regulated by police officers or traffic control signals, or at any point where a pedestrian tunnel or overhead crossing has been provided."
We experience no difficulty in concluding that Benjamin, the driver of the taxicab, was negligent, thus rendering him and his employer liable. *Page 71 
We now pass to a consideration of defendants' contention that plaintiff was guilty of contributory negligence. We observe that, before stepping into the lake side roadway of the avenue, plaintiff looked and continued looking in the direction of approaching traffic. At that time defendant's taxicab was some distance away — more than half the distance between Calliope and Clio Streets, or at least 150 feet — a circumstance sufficient to warrant plaintiff in believing that he could safely cross the roadway if the taxicab was being carefully and prudently operated and in obedience to the traffic ordinance. In that respect he was not negligent. Langley v. Viguerie, La.App., 189 So. 606; Sweeney v. New Orleans Public Service, Inc., La.App., 184 So. 740; Guillot v. Baton Rouge Yellow Cab Company, 18 La.App. 202, 138 So. 219; Langenstein et al. v. Reynaud, 13 La.App. 272, 127 So. 764.
But it is said that plaintiff saw the approaching taxicab and attempted to retrace his steps in order to escape the collision but failed. This factual contention is disputed by plaintiff, who asserts that he stopped, turned, faced the approaching cab, and signalled the driver of his presence with uplifted hand, seemingly a natural impulse of the moment. Conceding the defendant's factual contention, little comfort is afforded thereby. In Guillot v. Baton Rouge Yellow Cab Company, Inc., supra [18 La.App. 202, 138 So. 221], the court said:
"The proof here is that plaintiff saw the danger in the approaching car, and attempted to step backward to escape the collision, but failed. Even if he had not seen the danger, defendant is responsible under the rule of the last clear chance, as recognized in Tyler v. Gulf, C. S.F. Ry. Co., 143 La. [177], 178, 78 So. 438, because defendant, through Hudson, employee, `might by the exercise of ordinary care have seen the danger in time to avoid the injury.'"
We readily conclude that the last clear chance of avoiding the accident was with the defendant taxicab driver and that, as a consequence, the question of the primary or contributory negligence of plaintiff becomes unimportant. Benjamin was clearly at fault because of his failure, on seeing plaintiff enter the roadway a safe distance ahead, to take such measures as would place his taxicab under such control as ordinary care dictated and thus avoid the accident. He had ample time to reduce his speed, apply his brakes, and avoid striking the plaintiff. Having discovered the danger in time, he was negligent in failing to use reasonable precautions, by the exercise of which he could have averted the accident.
It is well recognized that a pedestrian has the same right to a street at an intersection made available for pedestrian crossing as a motorist has. It is also well recognized that, when a pedestrian attempts to cross at an intersection a reasonable distance ahead of a motorist, it becomes the duty of the motorist to allow him to pass and he cannot legally run him down. Rottman v. Beverly, 183 La. 947, 165 So. 153; Loewenberg v. Fidelity Union Casualty Company, La.App., 147 So. 81.
Hence, if we should concede that it was negligence for plaintiff to reverse his steps in the roadway as a result of fright, or other impelling cause, we cannot say that it was such negligence as would bar his recovery.
The other inquiry, whether the release assertedly obtained from plaintiff is a valid and binding compromise of all of his rights and claims growing out of the accident, is perhaps more debatable, though the proper answer is hardly less certain.
The instrument, which plaintiff testifies bears his signature, though he has no recollection whatever of signing it, and which he assails, recites that $10 was received in full payment of all claims and demands arising from or growing out of all injuries both to his person and property, as the result of the accident in question. The subscribing witnesses are Joseph Meyers and Walter Mumphrey, claim adjusters for the White Top Cabs, Inc., and Independent Cab Operators Association, respectively.
Referring to the facts leading up to and surrounding the consummation of the alleged settlement, the record discloses that immediately following the accident plaintiff was placed in defendant's taxicab, rushed to the Charity Hospital, and placed on a rolling table in the hallway adjoining the emergency accident room. Ten or fifteen minutes thereafter, Meyers, one of the adjusters, arrived at the hospital, having been notified by his company of the accident, and, after discussing the details thereof with the cab driver, proceeded to converse with plaintiff. A few minutes thereafter the other adjuster, Mumphrey, reached the hospital and was informed by Meyers, out of plaintiff's presence, that plaintiff "exonerated" *Page 72 
the taxicab driver. Both adjusters approached the table on which plaintiff was lying, and Mumphrey then proceeded to talk to plaintiff. They testified that plaintiff gave his version of the accident and thereupon Mumphrey asked plaintiff if he "exonerated" the cab driver. Receiving an affirmative reply, the document evidencing the release was prepared by Meyers and handed to plaintiff, who glanced at but did not read it, and then affixed his signature. Immediately upon execution of the release, plaintiff was removed to the operating room for medical attention.
Plaintiff denies all knowledge or recollection of the release. His testimony sharply disputes the testimony of the adjusters as to what was said or done in connection with, or the circumstances preceding, its confection. He testifies that the two adjusters approached him while he was suffering great pain from a comminuted fracture of the leg, general bruises and abrasions, and pain in the head as a result of his fall to the pavement; that they asked how he felt and he replied: "Bad. I feel bad. * * * It hurt me a lot"; that one of the adjusters, whose identity he could not fix, asked him: "Have you got any money?" to which he replied that he did not; that thereupon the same unidentified adjuster said: "Well, here is a few dollars you can have for cigarette money when you are lying up there, and we will come up later to see you". He further testifies that he was handed a five-dollar bill and was then wheeled out into the operating room, the adjusters having never returned as promised. Two days after the accident, two police officers interviewed plaintiff and obtained from him the details of the accident and of the visit of defendants' adjusters immediately following. This statement was reduced to writing and signed by the plaintiff. It is significant to note that this statement, given at an unsuspicious and unguarded moment, fully corroborates and confirms plaintiff's testimony as to what actually transpired when he was visited by the adjusters. The pertinent part of this written police statement recites:
"* * * while at the hospital two men called there and spoke to me and the driver and one of the men gave me $5.00 and told me he would come back and see me the next day but he failed to come back."
The following articles, pertinent to a discussion of this case, are found in our Civil Code under the title, "Of Transaction or Compromise":
3071. "A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.
"This contract must be reduced into writing."
3078. "Transactions have, between the interested parties, a force equal to the authority of things adjudged. They can not be attacked on account of any error in law or any lesion. But an error in calculation may always be corrected."
3079. "A transaction may be rescinded notwithstanding, whenever there exists an error in the person or on the matter in dispute. It may likewise be rescinded in the cases where there exists fraud or violence."
Also quite relevant are the following codal provisions of our substantive law:
1797. "When the parties have the legal capacity to form a contract, the next requisite to its validity is their consent. This being a mere operation of the mind, can have no effect, unless it be evidenced in some manner that shall cause it to be understood by the other parties to the contract. To prevent error in this essential point, the law establishes, by certain rules adapted to the nature of the contract, what circumstances shall be evidence of such consent, and how those circumstances shall be proved; these come within the purview of the law of evidence."
1812. "Express consent must be given in a language understood by the party who accepts, and the words by which it is conveyed must be in themselves unequivocal; if they may mean different things, they give rise to error, which, as is hereinafter provided, destroys the effect of a contract."
1824. "The reality of the cause is a kind of precedent condition to the contract, without which the consent would not have been given, because the motive being that which determines the will, if there be no such cause where one was supposed to exist, or if it be falsely represented, there can be no valid consent."
It is elementary that the law favors settlements fairly obtainable of disputed claims. It is no less true that contracts of compromise or settlement may be *Page 73 
vitiated by fraud or error of fact on the part of either party. To hold otherwise is to offer a premium for the encouragement of fraud, error of the matter in dispute, or violence, which it is the true mission of the courts to prevent. In considering a claim or allegation of fraud or error of fact in such cases, the court will inquire not alone into alleged false, deceitful, or misleading representations, but also into the circumstances attending the transaction tending to show whether the parties were dealing at arm's length and upon an equal footing.
As stated, plaintiff is a Norwegian citizen and was transiently in this country at the time of the accident. He understands, without great difficulty, the English language, though it is shown, when questioned as a witness, that he did not know the meaning of the word "exonerate." While in New Orleans he had lodgings at the Scandinavian Seamen's Home, where the spoken word is entirely Norwegian.
The facts attending the compromise in question show that the purported release was executed between the parties within a half hour after the accident, while plaintiff was lying on a rolling table upon which he was placed when admitted to the hospital, and before he had received medical attention. The extent or seriousness of his injuries was yet unknown to anyone. Undoubtedly, his serious injuries had the result of rendering him helpless and caused him to suffer considerable pain, as well as nervousness, weakness and mental shock. The adjusters had made no investigation of the accident. Plaintiff was not afforded the opportunity of consulting with friends, or other advisers, and was then in impecunious circumstances. The negotiations leading up to the transaction were initiated solely by defendants' agents. Prior to its execution no attempt was made by the agents to ascertain from any physician plaintiff's physical or mental condition and thus assure themselves that plaintiff was thoroughly competent to understand, negotiate and approve any disputed right or claim. The release was not read by plaintiff, nor was it read to him by the adjusters, and no one else but the adjusters and plaintiff was present.
In our opinion, the foregoing is sufficient to establish that the transaction which resulted in the execution of the release on the part of plaintiff was induced by an error of fact as to the matter in dispute, and also that he was not dealing on an equal footing with the defendants' representatives. Undue advantage was taken of his physical and mental condition, unable, as he was, to pay close attention, or exercise the same degree of care in transacting business matters, as he would have under ordinary circumstances. His main, and almost only, concern, was his helpless and painful condition and his immediate needs. The trifling sum paid him was not requested or demanded by him, but was offered by the overanxious adjusters, and in connection with which Mumphrey testifies that he considered it as a "gift".
The general theory of the law in regard to acts done and contracts made by parties affecting their rights and interests is that in all such cases there must be a free and full consent in order to bind the parties. Consent is an act of reason accompanied with deliberation, the mind weighing as in a balance the good and evil on each side. 1 Story, Equity, 22. It must be conceded that a deliberate mind presupposes the possession of mental faculties capable of reflection and rational thought. If these faculties are lacking, for want of sufficient development, or by reason of natural decay, or other physical infirmity, the law requires greater fairness on the part of those dealing with such subjects.
There can be no definite rule of law laid down as to what condition of mind or degree of mental incompetency can be held sufficient to avoid a contract made with a party taking advantage of it. As in the case of fraud, each case must necessarily depend upon its own circumstances. There are cases in which our courts have held that bereavement and grief, coupled with receipt of an unreasonably small amount, when it is obvious that the mental condition of the one receiving does not permit of rational and clear thinking, are enough to warrant the rescinding of the contract. Galt v. Travelers' Insurance Company, La.App., 141 So. 105; Johnson v. National Casualty Company, La.App., 176 So. 235.
It is a matter of good policy and good morals to stamp the law's disapproval upon settlements which bear the taint of fraud and undue advantage. In the case of Reed v. Holderith, 3 La.App. 378, we said:
"Courts must look with distrust and disfavor upon settlement or compromise effected between active and experienced agents of accident insurance companies *Page 74 
with illiterate and untutored laborers, made destitute by their injuries, for a lump sum bearing but a small proportion to the amount which the laborer would recover if he was otherwise entitled to a judgment. 138 N.W. 483."
We conclude that the release or compromise relied upon by defendants was and is not a valid and binding transaction so as to defeat plaintiff's right to recovery. That being true, the pleas of res adjudicata and estoppel are without merit.
Defendant's contention that plaintiff should have offered to return the sum paid at the time of the execution of the document of release in order to state a right and cause of action is equally not tenable. The adjuster who paid the amount testified that plaintiff asked for a "couple of dollars and I gave him two fives", and that this payment was made as a "gift". Having this philanthropic character, it was not a consideration which formed a sufficient basis for the execution of the release, and, consequently, imposed no obligation on the part of plaintiff to return or tender the gratuity.
We shall now consider the quantum of damages. According to the medical testimony, plaintiff sustained a comminuted fracture of the upper end of the tibia, with lacerations, requiring debridement, or cleaning of the wound of the left leg. Anti-tetanic serum was administered and plaintiff's leg was placed in a plaster cast. It was necessary for him to remain in the hospital for about eighteen days and he was then returned to his lodgings, where he was confined for about four months, unable to walk without the use of crutches. The cast was removed at the end of this period. After discarding the crutches, plaintiff used a cane to assist him in walking. It can be safely said that the period of his disability did not exceed six months. The medical testimony shows further that plaintiff, at the time of the trial below, had fully recovered, his leg having completely healed, with no impairment or disability of any nature.
We believe that the amount of $1,500 would be adequate compensation for this particular item of damages. Breaux v. Roussel, La.App., 151 So. 267; Thomas v. Shippers' Compress 
Warehouse Company, La.App., 158 So. 859.
Referring to the claim for loss of earnings, we find that more specific and definite proof might have been presented. There is no doubt that plaintiff was totally incapacitated, as the result of his injuries, for the six-month period. The fault to be found in the presentation of this claim lies in the fact that more definite proof on which to base an award might have been produced. The amount should naturally depend on what plaintiff's average earnings were prior to the time he was injured. The record discloses, however, that plaintiff is a licensed chief engineer, and that he has been regularly employed in that capacity on ships plying European and American waters. It is also shown that, save for intermittent short periods, as is commonly the case with seamen awaiting departure of ships, his earnings have been consistent and have averaged $200 per month. Defendants did not produce any testimony to contradict this evidence. Having determined that his disability extended over a period of six months, he is entitled to recover the sum of $1,200 for loss of earnings, which, in our opinion, seems fair and just.
The claim of $200 for room and board while convalescing has not been established with such reasonable certainty as to merit recognition.
As we have already observed, the Board of Administrators of the Charity Hospital at New Orleans has not appealed from the judgment dismissing plaintiff's suit. For this reason, whatever rights it may have had by virtue of Act 289 of 1938 may not be availed of in this proceeding. See Morris v. Hava, La.App., 180 So. 216.
For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be and it is annulled, avoided and reversed, and it is now ordered that there be judgment herein in favor of plaintiff, Erling Lervick, and against the defendants, White Top Cabs, Inc., Independent Cab Operators Association, and John Benjamin, in solido, in the sum of $2,700, with legal interest from date of judicial demand until paid, and for all costs.
Reversed. *Page 105