Gray, Appellant, *v.* Grunnagle.

146

Argued October 1, 1965.  Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused December 5, 1966.

*Frank W. Cubbon, Jr.,* with him *Joseph U. Esper,* for appellant.

*Bruce R. Martin,* for appellee.

*Francis E. Shields,* and *Pepper, Hamilton and Scheetz,* for amicus curiae.

OPINION BY MR. JUSTICE O'BRIEN, June 24, 1966:

This action of trespass was brought in the Court of Common Pleas of Allegheny County, Pennsylvania, by Charles Gray, the plaintiff-appellant, alleging that he suffered injuries, damages and disabilities resulting from the negligent surgery, diagnosis, abandonment, and failure to secure the necessary consent by the defendant, Jerome Grunnagle, M.D.  The case was tried before a judge and jury.  During the trial, appel-

lant withdrew the charge of abandonment, and the trial judge ruled that the case could not go to the jury on either of the issues of negligent diagnosis or negligent surgery, and submitted the case to the jury solely on the issue of consent. The jury returned a verdict of $80,000 for the plaintiff, following which defendant filed a motion for judgment n.o.v. and for a new trial. The plaintiff, although satisfied with the verdict, filed a contingent motion for a new trial, asking that if a new trial be awarded to defendant, the question of negligence, in both the diagnosis and the performance of surgery, be submitted to the jury.

These motions were argued before a court en banc. The court en banc granted the judgment n.o.v. and overruled plaintiff's contingent motion for a new trial, and it is from the entry of judgment n.o.v. and the overruling of appellant's new trial motion that this appeal is taken.

The appellant, Charles B. Gray, now paralyzed from the waist down, had experienced some difficulty with his left leg during his army service, which covered a period of approximately 4 years, from 1941 through his discharge in 1945. This condition slowly progressed until early in 1960, at which time there was some muscular atrophy of the left leg. The left foot would invert during occasional periods of fatigue and would cause him some difficulty.

Mr. Gray was originally examined by a Dr. Blakley, an orthopedic surgeon of Pittsburgh, Pennsylvania, on January 4, 1960, at which time hospitalization was recommended. Subsequently, Mr. Gray was admitted to the Allegheny General Hospital on January 18, 1960, at which time he signed a Consent to Operation, which reads as follows:

"WHEREAS, I, /s/ Chas. B. Gray residing at No. ——————————— Street, ——————————— (City and State) and now in the Allegheny General Hospital of Pittsburgh, Pa.; and of full age, have been informed by

the physicians of said hospital that in their opinion an operation on me is necessary for the proper treatment of my illness. I hereby consent to the same and said physicians are hereby authorized to employ whatever operative procedure they deem necessary, using their best skill and judgment.

"WITNESS, my hand and seal, at said hospital, in the City of Pittsburgh, Pennsylvania, this 18th day of Jan., A.D. 1960.

"Attest: /s/ ——————————— /s/ Charles B. Gray."

This instrument is signed by Charles B. Gray and witnessed by one Helen Miladin.

Dr. Blakley called in the defendant-appellee, Dr. Jerome F. Grunnagle, a specialist in neurosurgery, who examined Mr. Gray on *January 19, 1960,* reaching a tentative diagnosis of lesion of the dorsal, or thoracic, cord, which was either disc, tumor in the sense of either benign or malignant neoplasm, degeneration, or a combination of them, which he thought was probably in the T-8, T-9, T-10 area.

As a result of his tentative diagnosis, Dr. Grunnagle ordered four tests to be conducted. However, not all those ordered were carried out. Among those ordered and performed was a myelogram, and based upon the findings of this test, Dr. Grunnagle wrote to Dr. Blakley that he favored an exploratory laminectomy, to which Dr. Blakley agreed. Mr. Gray was then transferred as a patient from Dr. Blakley's care to Dr. Grunnagle, and the operation was performed on Mr. Gray by Dr. Grunnagle on *January 25, 1960.*

Dr. Grunnagle, in his testimony, discussed the operation which he performed on Mr. Gray. He first described the various components of the spinal column. This is a cord surrounded by a fine, transparent membrane called the "arachnoid mater". There is then an outer fibrous elastic membrane called "dura mater".

Over this is a layer of fat, bony substance called the "laminae". Protruding from the spinal column are small bones called "spinous processes". On the day of the operation, the patient was placed face down on the operating table and anesthetized. An incision was made in the thoracic spinal area. After the incision was made through the dura and the arachnoid, the cord appeared small in the affected area. This observation formed the basis for part of the diagnosis, showing that a large number of cells had died and disappeared.

As indicated by the testimony of Dr. Grunnagle, it was necessary to see if there was anything in front of the dura involving the spinal cord. It was necessary to cut into the dura and the arachnoid and to sever points of attachment of the dentate ligaments in order that he be able to rotate the spinal cord itself, so that he could get a glimpse in front of the cord. There was no neoplasm, but a bulging disc was noted which was pushing the dura up against the cord. No effort was made to remove the disc, as such surgery was considered too dangerous to be attempted. Dentate ligament attachments (the continuous ligament on each side of the cord which are attached by small, triangular shaped attachments to the dura mater), in addition to those which had already been cut in order to rotate the cord, were then cut. These dentate ligaments hold the spinal cord in an upright position. The purpose of this Kahn technique is to relieve the pressure of the bulged disc on the front of the cord and the counter stress on the cortico-spinal track within the posterior cord, which counter pressure is exerted by the tough, nonelastic dentate ligament attachments holding the spinal cord against the pressure from the front. In performing this surgery, it was necessary to remove the laminae and the spinous processes in the area of the 3rd, 4th, 5th and 6th thoracic vertebrae. The dura and the arachnoid were also incised. The doctor's

notes at the conclusion of this surgery read as follows: "The posterior part of the cord appeared small, particularly right over the area of pathology. The dura was then closed with a continuous lock stitch of black silk. Hemostasic was then ascertained and the muscles, heavy fascia, subcutaneous layer and skin were approximated with interrupted black silk. Patient withstood the procedure well."

Following the operation, Dr. Grunnagle carried out normal, follow-up procedures. Mr. Gray was discharged from the hospital on February 6, 1960. Dr. Grunnagle saw him several times thereafter in 1960 and February 14, 1961, was the last time he saw Mr. Gray as his patient. Mr. Gray has not been able to walk since this operation. On the occasion of his last visit, Dr. Grunnagle found that the paralysis was due to the disc. This was the fundamental cause of plaintiff-appellant's disability. The doctor recommended that Mr. Gray be readmitted to the hospital for further surgery, which he felt should improve Mr. Gray's condition.

Dr. Grunnagle stated he had no way of knowing what he would find until the operation was under way. Both the roentgenologist at Allegheny General Hospital and Dr. Blakley were under the impression preoperatively that a spinal cord tumor was probably present; however, Dr. Grunnagle was of the opinion that it was more likely the lesion was a disc, although he could not eliminate the possibility that it was a neoplasm without actual surgery. There was no test which could be performed, other than actual surgery, which would have revealed the exact nature of the problem in this case. The record reveals that Dr. Grunnagle had relied on Mr. Gray's signed consent to an operation. This consent, signed on January 18, 1960, the date of his admission to the hospital, was offered in evidence at the trial. It should be noted that in

his testimony, Dr. Grunnagle stated that plaintiff-appellant's condition was becoming progressively worse and would have continued to deteriorate without surgery, although he could not say what the ultimate result would have been had Mr. Gray not undergone surgery.

The development of the law in this field was well stated by Chief Justice BARNHILL of the Supreme Court of North Carolina in the case of *Kennedy v. Parrott*, 243 N.C. 355, 90 S.E. 2d 754 (1956), as follows: "Prior to the advent of the modern hospital and before anesthesia had appeared on the horizon of the medical world, the courts formulated and applied a rule in respect to operations which may now be justly considered unreasonable and unrealistic. During the period when our common law was being formulated and applied, even a major operation was performed in the home of the patient, and the patient ordinarily was conscious, so that the physician could consult him in respect to conditions which required or made advisable an extension of the operation. And even if the shock of the operation rendered the patient unconscious, immediate members of his family were usually available. Hence the courts formulated the rule that any extension of the operation by the Physician without the consent of the patient or someone authorized to speak for him constituted a battery or trespass upon the person of the patient for which the physician was liable in damages.

"However, now that hospitals are available to most people in need of major surgery; anesthesia is in common use; operations are performed in the operating rooms of such hospitals while the patient is under the influence of an anesthetic; the surgeon is bedecked with operating gown, mask, and gloves; and the attending relatives, if any, are in some other part of the hospital, sometimes many floors away, the law is in a

state of flux. More and more courts are beginning to realize that ordinarily a surgeon is employed to remedy conditions without any express limitation on his authority in respect thereto, and that in view of these conditions which make consent impractical, it is unreasonable to hold the physician to the exact operation—particularly when it is internal—that his preliminary examination indicated was necessary. We know that now complete diagnosis of an internal ailment is not effectuated until after the patient is under the influence of the anesthetic and the incision has been made.

"These courts act upon the concept that the philosophy of the law is embodied in the ancient Latin maxim: *Ratio est legis anima; mutata legis ratione mutatur et lex.* Reason is the soul of the law; the reason of the law being changed, the law is also changed. (Emphasis supplied)

"Some of the courts which realize that in view of modern conditions there should be some modification of the strict common law rule still limit the right of surgeons to extend an operation without the express consent of the patient to cases where an emergency arises calling for immediate action for the preservation of the life or health of the patient, and it is impracticable to obtain his consent or the consent of someone authorized to speak for him. Jackovach v. Yocom, supra; King v. Carney, 204 P. 270, 26 A.L.R. 1032.

"Other courts, though adhering to the fetish of consent, express or implied, realize 'that the law should encourage self-reliant surgeons to whom patients may safely entrust their bodies, and not men who may be tempted to shirk from duty for fear of a law suit.' They recognize that 'The law does not insist that a surgeon shall perform every operation according to plans and specifications approved in advance by the patient, and carefully tucked away in his office-safe for courtroom purposes.' Barnett v. Bachrach, 34 A. 2d 626, . . . .

"In major internal operations, both the patient and the surgeon know that the exact condition of the patient cannot be finally and definitely diagnosed until after the patient is completely anesthetized and the incision has been made. In such case the consent—in the absence of proof to the contrary—will be construed as general in nature and the surgeon may extend the operation to remedy any abnormal or diseased condition in the area of the original incision whenever he, in the exercise of his sound professional judgment, determines that correct surgical procedure dictates and requires such an extension of the operation originally contemplated. This rule applies when the patient is at the time incapable of giving consent, and no one with authority to consent for him is immediately available. King v. Carney, supra; Baxter v. Snow, 2 P. 2d 257; Jackovach v. Yocom, supra.

"In short, where an internal operation is indicated, a surgeon may lawfully perform, and it is his duty to perform, such operation as good surgery demands, even when it means an extension of the operation further than was originally contemplated, and for so doing he is not to be held in damages as for an unauthorized operation. . . ."

There is no question but that plaintiff-appellant did sign a consent to an operation when admitted to the Allegheny General Hospital on the *18th day of January,* when under the care of Dr. Blakley, which has previously been set out in this opinion. Mr. Gray knew that a myelogram had been made and was reasonably sure that an exploratory operation was to be performed on his back; however, it seems he did not understand the technical meaning of the term "exploratory". From the testimony given, it is apparent that Mr. Gray underwent an exploratory laminectomy. This means that an incision is made in the back in the area of the spinal column at the appropriate vertebra;

that the source of the trouble is observed, if possible, and that every effort is then made to remove it, correct it, or alleviate the symptoms if feasible. Mr. Gray was apparently of the opinion that if the cause of his discomfort could be ascertained, that he would then be sewn up and, in due course, advised of the nature of his malady and could then determine if he wished to undergo corrective surgery.

At this point, we must consider certain well-settled principles of the law. As we said in *Donaldson v. Maffucci,* 397 Pa. 548, 553, 156 A. 2d 835 (1959), and cases cited therein: "In the absence of a special contract, a physician or surgeon is neither a warrantor of a cure nor a guarantor of the result of his treatment . . ." Furthermore, a physician is bound by the expert testimony rule so well explained by Chief Justice STERN in *Robinson v. Wirts,* 387 Pa. 291, 127 A. 2d 706 (1956): ". . . no presumption or inference of negligence arises merely because the medical care or surgical operation terminated in an unfortunate result which might have occurred even though proper care and skill had been exercised, and where the common knowledge or experience of laymen is not sufficient to warrant their passing of judgment. In such cases the doctrine of res ipsa loquitur or of exclusive control may not be invoked, and expert testimony in support of the plaintiff's claim is an indispensable requisite to establish a right of action."

The burden of proof in a malpractice action is upon the plaintiff to prove either that the physician or surgeon did not possess and/or employ the required skill and knowledge or that he failed to exercise the judgment of a reasonable man in like circumstances and the injury to the patient resulted from a failure on the part of the physician to possess, and/or employ that skill required, or his failure to exercise reasonable judgment under like circumstances. In the instant

case, on the basis of the testimony and evidence offered, the trial judge was correct in not allowing issues of negligence in diagnosis or surgery to be submitted to the jury.

As to the question of consent on the part of Mr. Gray for the operation, in which Mr. Gray asserts Dr. Grunnagle went beyond the scope of the consent granted, our court, in *Smith v. Yohe*, 412 Pa. 94, 106, 194 A. 2d 167 (1963), stated: "The principles of law applicable to this phase of the litigation are clear. Such principles are: (a) where a patient is mentally and physically able to consult about his condition, in the absence of an emergency, the consent of the patient is ' " 'a prerequisite to a surgical operation by his physician' " ' and an operation without the patient's consent is a technical assault (Moscicki v. Shor, 107 Pa. Superior Ct. 192, 195, 163 A. 341; Dicenzo v. Berg, 340 Pa. 305, 307, 16 A. 2d 15); (b) the burden is on plaintiff to prove 'that the operation performed, or substantially that operation, was not authorized by him': Dicenzo v. Berg, supra, 307."

"Consent" has been defined in Black's Law Dictionary as: "CONSENT. A concurrence of wills. Voluntarily yielding the will to the proposition of another; acquiescence or compliance therewith. Twin Ports Oil Co. v. Pure Oil Co., D.C. Minn., 26 F. Supp. 366, 371. Agreement; the act or result of coming into harmony or accord. Glantz v. Gabel, 66 Mont. 134, 212 P. 858, 860.

"Consent is an act of reason, accompanied with deliberation, the mind weighing as in a balance the good or evil on each side. 1 Story, Eq. Jur. Sec. 222; Lervick v. White Top Cabs, La. App. 10 So. 2d 67, 73. It means voluntary agreement by a person in the possession and exercise of sufficient mentality to make an intelligent choice to do something proposed by another. People v. Kangiesser, 44 Cal. App. 345, 186 P. 388, 389.

It supposes a physical power to act, a moral power of acting, and a serious, determined, and free use of these powers. Fonblanque, Eq. b. 1, c. 2, s. 1; New Jersey Mfrs' Casualty Ins. Co., 148 A. 790, 791, 106 N.J.L. 238. Consent is implied in every agreement. It is an act unclouded by fraud, duress, or sometimes even mistake. Heine v. Wright, 76 Cal. App. 338, 244 P. 955, 956.

"There is a difference between consenting and submitting. Every consent involves a submission; but a mere submission does not necessarily involve consent. 9 Car. & P. 722.

" 'Consent' is an active acquiescence as distinguished from 'assent' meaning a silent acquiescence. People v. Lowe, 205 N.Y.S. 77, 78, 209 App. Div. 498. 'Consent' means an active circumstance of concurrence; 'assent' is a passive act of concurrence before another does the act charged. Perryman v. State, 63 Ga. App. 819, 12 S.E. 2d 388, 390. But the two terms may be used interchangeably. Bartlett v. Sundin, 169 N.Y.S. 391, 393, 182 App. Div. 117."

Quoting from Robert E. Powell's excellent article on Consent to Operative Procedures, 21 Md. L. Rev. 189, 191 (1961) : "In order to understand the nature of consent it is necessary at the outset to have some understanding of the legal relationship between the physician and his patient. This relationship is essentially contractual in nature.[11] (Footnote omitted) More often than not the contract is raised by implication from the dealings between the parties, and in a like manner the acts to be performed by the parties are impliedly defined. Thus, if a patient consults a surgeon for the purpose of removing a tumor from his arm, a contract is entered into which requires the surgeon to remove the tumor. Therefore, he must not digress from that contract and also remove the patient's appendix. In short, the surgeon must operate in accordance with

the agreement made between the parties. Consent for the operation or treatment arises from the contract and is given only in connection with what the parties understood was to be done. Thus, in the illustration above, the patient did not consent to the performance of any operation other than the removal of the tumor, and if the surgeon removed the appendix as well, he would be liable in damages. It is noted that in such a case the patient might well rely on an action for breach of contract.[12] (Footnote omitted) However, he may base his action on a tortious assult and battery and recover punitive damages which are not available in contract actions."

The Supreme Court of Minnesota, in *Bang v. Charles T. Miller Hospital*, 88 N.W. 2d 186 (1958), reiterated what it felt to be the well established general rule that: ". . . before a physician or surgeon may perform an operation on a patient he must obtain the consent either of the patient, if competent to give it, or of some one legally authorized to give it for him unless an immediate operation is necessary to save the patient's life or health, although under exceptional circumstances the consent may be regarded as having been impliedly given. Annotation, 76 A.L.R. 562, and cases cited, including Mohr v. Williams, 95 Minn. 261, 104 N.W. 12, 1 L.R.A., N.S., 439. Also see, Annotation, 56 A.L.R. 2d 695.

"While we have no desire to hamper the medical profession in the outstanding progress it has made and continues to make in connection with the study and solution of health and disease problems, it is our opinion that a reasonable rule is that, where a physician or surgeon can ascertain in advance of an operation alternative situations and no immediate emergency exists, a patient should be informed of the alternative possibilities and given a chance to decide before the doctor proceeds with the operation. By that we mean

that, in a situation such as the case before us where no immediate emergency exists, a patient should be informed before the operation that if his spermatic cords were severed it would result in his sterilization, but on the other hand if this were not done there would be a possibility of an infection which could result in serious consequences. Under such conditions the patient would at least have the opportunity of deciding whether he wanted to take the chance of a possible infection if the operation was performed in one manner or to become sterile if performed in another . . ."

In *Scott v. Wilson,* the Court of Civil Appeals of Texas, 396 S.W. 2d 532, 535 (1965), in an action to recover damages for malpractice, reversed the trial court which directed a verdict in favor of a physician at the close of plaintiff's testimony. The main question presented in that case was whether Dr. Wilson had reasonably and adequately informed Mr. Scott of the dangers and hazards to be anticipated from the contemplated stapedectomy operation so as to prepare him to give a knowledgeable consent to the operation. In holding that the directed verdict should not have been granted where a fact issue was raised on conflicting testimony as to whether the physician made a full disclosure of the risks, dangers, and possible collateral hazards of the operation, the court said: "We find no authorities in this State directly in point, but there are authorities from other jurisdictions that are in point. Bowers v. Talmage (Bowers v. von Storch), Fla. App., 159 So. 2d 888, wherein it is held that where there is no emergency the doctor is under a duty to adequately inform the patient as to the dangers to be anticipated as a result of the operation, and not to minimize them. Whether the doctor complied with that duty was there a question for jury determination.

"In Russell v. Harwick, Fla. App., 166 So. 2d 904, the Court held that the doctor was negligent in failing

to inform the patient as to the alternate methods of surgical treatment he contemplated, and in proceeding without the informed consent of the plaintiff.

"In the very recent case of DiRosse v. Wein, 24 A.D. 2d 510, 261 N.Y.S. 2d 623, the Court said: 'We are of the opinion that, under the facts and circumstances disclosed by this record, including the fact that no immediate emergency existed, defendant was obligated to make a reasonable disclosure to his patient of the known dangers which were incident to or possible in the proposed use of gold; and that the trial court, therefore, did not err in charging, in substance, that defendant could be found guilty of malpractice if he failed in that duty (cf. Natanson v. Kline, 186 Kan. 393, 350 P. 2d 1093, rehearing denied 187 Kan. 186, 354 P. 2d 670; Mitchell v. Robinson, 334 S.W. 2d 11 [Missouri]).'

"In Mitchell v. Robinson, Mo. 334 S.W. 2d 11, the Supreme Court of Missouri said: 'In the particular circumstances of this record, considering the nature of Mitchell's illness and this rather new and radical procedure with its rather high incidence of serious and permanent injuries not connected with the illness, the doctors owed their patient in possession of his faculties the duty to inform him generally of the possible serious collateral hazards; and in the detailed circumstances there was a submissible fact issue of whether the doctors were negligent in failing to inform him of the dangers of shock therapy.' . . . There can be no doubt that the stapedectomy operation performed on Scott was an elective operation and performed under such circumstances as to require of Dr. Wilson that he reasonably and adequately warn Scott of the known hazards and dangers that might probably be expected from such an operation, and the chances of favorable and unfavorable results to be contemplated. *The consent which Scott gave to have the operation performed*

160

*is of no effect unless it was an informed and knowledgeable consent.* There is no question here as to Scott's being injured and suffering damages as a result of the operation. If Dr. Wilson did not have Scott's informed consent to operate upon him he would be guilty of assault and battery on Scott, and liable for the damages caused by the operation. Moss v. Rishworth, Tex., Com. App., 222 S.W. 225." (Emphasis supplied)*

Concerning the informing of Mr. Gray as to the forthcoming surgery and its potential collateral effects, the cross-examination of Dr. Grunnagle, inter alia, was as follows: "Q. Do you have any recollection as to what advise [sic] you gave Mr. Gray relative to the potential risks? A. I don't know exactly what I told him, no. I can't remember that. I told him it was a serious operation. There are many risks involved, not only as to paralysis, but as to life. Q. But you don't have any specific recollection of how much detail you went into when you explained this to him? A. No, I don't. Q. Can you tell us when you told Mr. Gray as to these risks and hazards? A. Well, some time—either the 22nd, or the 23rd, or the 24th of January. Q. And you are basing your answer now, I take it, on the fact that you did not see or become aware of the myelographic finding until January 22nd of 1960, is that right? A. That's right. Q. As I recall from the hospital record, it indicates that Mr. Gray was admitted on a Monday, January the 18th, is that true? A. Well, it's January the 18th, yes. Q. So then, January the 22nd of 1960 would have been a Friday. A. Right. . . . Q. You made your recommendation for surgery on January the 22nd? A. On the

---

* See also *Gulf & S.I.R. Co. v. Sullivan*, 155 Miss. 1, 119 So. 501 (1928) ; *Woods v. Brumlop*, 71 N.M. 221, 377 P. 2d 520 (1962) ; *Natanson v. Kline*, 186 Kan. 393, 350 P. 2d 1093, 187 Kan. 186, 354 P. 2d 670 (1960).

chart I did. I may have spoken to the patient before this. I don't recall. Q. But as far as the record is concerned, you made your recommendation for surgery on January the 22nd? A. That's my note to Dr. Blakley, yes. It's in the hospital record so that he can read it. Q. Surely. That is your written note to Dr. Blakely? A. That is correct. Q. So the point being, then, that the case had not yet been referred to you by Dr. Blakley as of January 22nd, had it? A. Oh, yes, it had been referred to me when he had asked me for consultation, but it had not been transferred to me. Q. Explain the difference. A. When a patient is referred, they are referred for consultation by a doctor to get another doctor's opinion. When the case is transferred, it is transferred from one service to the other doctor's service. Q. So then, the case was not transferred to you for the purposes of your contemplated surgery until January the 24th of 1960, a Sunday? A. They usually transfer it either just before surgery or just after. I will check. MR. MARTIN: We can save time. It was the 24th, if that is what you are trying to prove. MR. CUBBON: I merely want to establish a point. BY MR. CUBBON: Q. That has been agreed to by your counsel. A. Yes, here it is (indicating). Q. Did you find it? A. The 24th. Q. Then would you have explained the risks and hazards of this proposed surgery to Mr. Gray during the day or the evening—or would you know? A. I wouldn't know. Q. Perhaps, to refresh your recollection, let me respectfully direct your attention to this page which is in the nurses' notes. It would be under the date of January 22nd, 1960. Right here (indicating). Now, Doctor, respectfully directing your attention to the nurses' notes under date of January 22, 1960. This is the day that you made your recommendation or proposal for an exploratory surgery. Would you read the notation starting at 8:30 p.m. that day? A. 'Concerned about ap-

proaching surgery. Would like to know what is going to be done. No specific complaints.' Q. You say that as a matter of practice and routine you always advise patients, such as Mr. Gray, as to the potential risks of surgery? A. Yes, I did. Q. Always, Doctor? A. Unless they are comatose or mentally incompetent. Q. Was Mr. Gray in possession of his mental faculties at the time he was in the hospital, and up to the time he was operated on? A. Yes, he was. Q. *He certainly was not in any state of a so-called medical emergency that his situation dictated and commanded immediate surgery, was it? A. No. Q. Then summing up—and being fair to both sides—you do not have any specific recollection of advising Mr. Gray as to these risks of surgery. A. No, I am afraid I can't remember that far back to one specific patient."* (Emphasis supplied)

The only logical conclusion which can be reached from the aforementioned testimony is that Mr. Gray was apprehensive about his forthcoming surgery, that he wanted to know what was going to be done, and that Dr. Grunnagle was not positive as to whether or not he had explained the operation to Mr. Gray and the potential risks which might be involved. The testimony of Dr. Grunnagle reveals that the operation was a serious one and it involved risks "not only as to paralysis but as to life". Dr. Grunnagle also stated in regard to the exploratory laminectomy: "Q. Now, this laminectomy, the exploratory laminectomy, that you proposed, this is considered major surgery, is it not, Doctor? A. Yes, it is. Q. Certainly with major surgery, there are certain risks and hazards that go along as part and parcel of such a surgery? A. Yes. Q. In fact, in this surgery the surgical risks, or hazards, ran as high as 15 to 20% of Mr. Gray's condition being worse after the surgery than before, did it not? A. With a protruded disc it does, yes, in the thoracic region. Q. This was basically your diagnosis at the

time, that you suggested the exploratory laminectomy, was it not? A. Yes, either disc or tumor. Q. So then, taking into consideration the seriousness and the risks and hazards that were involved with this type of proposed surgery, I take it that it was the accepted standard of medical care prevailing in this Pittsburgh area in 1960, January, to advise the client of these potential risks and hazards, was it not? A. We always tell our patient that there are risks in surgery of the spinal cord; that there are risks of paralysis and worsening of already existing paralysis. . . . Q. The point is, then, that it was the accepted standard of medical care in the Pittsburgh area to so advise the patient, and specifically Mr. Gray, as to the potential risks and hazards regarding this surgery that you proposed? A. Yes. Q. Did you so advise Mr. Gray? A. Yes, I did. Q. What did you advise him relative thereto? A. I can't recollect my exact words to him, or the exact conversation, but it is my policy to always let the patient know the risks involved in surgery. Now, how much we go into this depends somewhat on the patient and somewhat on the surgery; but I am sure we have told him that there was a possibility of worsening his paralysis. We always tell patients who we are operating on their spinal cord, and most patients that we are operating on the brain, we tell them this."

Therefore, in the instant case, in summarizing the testimony of Dr. Grunnagle, we find the operation was serious, it involved many risks with a 15 to 20% chance of paralysis, that it was customary to inform the patient of the risks involved and that Dr. Grunnagle thought he had done so but apparently was not certain, stating specifically on cross-examination: "Q. Then summing up—and being fair to both sides—you did not have any specific recollection of advising Mr. Gray as to these risks of surgery. A. No, I am afraid I cannot remember that far back to one specific patient."

Mr. Gray testified that prior to the operation, Dr. Grunnagle had neither explained nor discussed his forthcoming surgery and the possible collateral risks involved. Mr. Gray's testimony reveals that: "Q. Now, going back to the time prior to, or before your surgery, did you have any discussion of this potential surgery with Dr. Grunnagle? A. I did not. Q. Did he mention it to you at all? A. He did not. Q. Did he advise you that you were scheduled for surgery? A. I was under the impression that I was going to have a 'exploratory operation'. He was going to try to arrive at a diagnosis. I thought I was going to have a 'exploratory operation'. Q. Who advised you thusly? A. Dr. Renton advised me of that. Q. Had anyone ever explained to you the potential risk and hazards with surgery? A. No one did. . . . Q. What day do you say that Dr. Grunnagle saw you before the operation? A. Dr. Grunnagle saw me Tuesday. I was admitted to the hospital on Monday. He saw me Tuesday after-noon, and then he saw me again Thursday evening. I'd say it was after 5:30—after 6:00 o'clock on Thursday evening. Q. That was after the second time that you had been down to the room where myelograms were taken, is that right? A. That was after the second time, after I had been returned to my room, yes, sir. Q. Did he discuss the Myelogram with you? A. No, sir, he did not. Q. What did he do? A. He just came in and he looked at the chart and said that he would see me later. Q. Are you telling us, sir, that when you went into that operating room on the 25th, you didn't know that they were going to operate on your spine? A. When I went into that operating room, it's the truth that I thought I was going to undergo an exploratory operation. Q. An exploratory where? In the foot? In your back? In where? A. Well, I was reasonably sure it was my back, but I didn't get that from Dr. Grunnagle. Q. Who did you get it from? A.

I got that from Dr. Renton. I think that's the gentleman's name that visited me. Q. What else did you get from Dr. Renton? A. Dr. Renton told me the first Myelogram was inconclusive, and they were going to give another one the next day and that he would perform the Myelogram, the second Myelogram. Q. What did he tell you about the operation? A. He didn't tell me anything about the operation. Q. At any time? A. Yes, sir. Q. Well, I don't know whether you are saying 'anything bout it', or 'at any time', or 'he didn't'. A. I meant to say that he told me something about it at one time. Q. What did he tell you that time? A. On a Sunday evening after my unsuccessful attempt to get in touch with Dr. Grunnagle, Dr. Renton came to my room, and I was upset and shook up because I had been shaved, and I didn't know what was going to happen to me. Dr. Renton told me not to worry about it, that it was exploratory in nature and that I would be home in six days."

In considering a motion for judgment n.o.v., the evidence together with all reasonable inferences therefrom is considered in the light most favorable to the verdict winner. *Lewis v. United States Rubber Co.,* 414 Pa. 626, 202 A. 2d 20 (1964); *Pritts v. Wigle,* 414 Pa. 309, 200 A. 2d 386 (1964); *Chambers v. Montgomery,* 411 Pa. 339, 192 A. 2d 355 (1963), and in reviewing on appeal, we stated in *Vignoli v. Standard M. Freight, Inc.,* 418 Pa. 214, 210 A. 2d 271 (1965): "The grant or refusal of a new trial will not be reversed on appeal, absent an abuse of discretion or error of law which controlled the outcome of the case." See *Chambers v. Montgomery,* supra.

Quoting again from Robert E. Powell, Consent to Operative Procedures, supra, concerning an express consent: "There is little difficulty in regard to consent, if the patient, either on his own initiative or by solicitation at the instance of a physician or a nurse consents

either in writing or verbally to the undertaking of operative procedures in an attempt to remedy the pathological condition of which he complains. As indicated, express consent can be obtained either by having the patient sign a written statement or through the making of an oral agreement. In either case, since the agreement between the physician and his patient is contractual in nature, for there to be valid consent it must be clear that both parties understand the nature of the undertaking and what the possible as well as expected results might be. As will be more thoroughly discussed later, it will be no defense for a surgeon to prove that the patient had given his consent, if the consent was not given with a true understanding of the nature of the operation to be performed, the seriousness of it, the organs of the body involved, the disease or incapacity sought to be cured, and the possible results." We believe that Mr. Powell was certainly correct, particularly in his statement that "it will be no defense for a surgeon to prove that the patient had given his consent, if the consent was not given with a true understanding of the nature of the operation to be performed. . .".

Reviewing the entire record, in that light, particularly the testimony of Dr. Grunnagle and Mr. Gray, we conclude that the trial judge reached the proper conclusion in holding that "Thus the only issue for the jury was whether or not plaintiff had consented to the operation or substantially the operation that was performed on him."

The trial judge was correct on this point but erred in granting the judgment n.o.v. The record discloses that Mr. Gray had signed a consent at the time he was admitted to the hospital. This consent was signed while he was under the care of Dr. Blakley and before the appearance of Dr. Grunnagle. Certainly, under these circumstances, Dr. Grunnagle could not or should

not have assumed that this consent was intended for him.  Assuming, arguendo, however, that the consent was intended for Dr. Grunnagle, this certainly could not have been an informed consent on the part of Mr. Gray.

Mr. Gray's apprehension and continued questioning of nurses and a resident physician certainly is indicative that he was very uncertain of what surgical procedures were to be performed upon him.  He could not have consented, certainly, with any knowledge or understanding of an impending operation on January 18, 1960, the date of his admission to the hospital, and at which time neither diagnostic tests had been performed, nor had surgery been discussed.  Testimony in the record shows that Dr. Grunnagle had not decided to operate until January 22, 1960, four days after the consent was signed by Mr. Gray.  It is important and should be noted that at the time the consent in question was signed, Mr. Gray was under the care of Dr. Blakley, and Dr. Grunnagle had neither seen nor spoken with Mr. Gray on that date.

Viewing the testimony in the light most favorable to appellant, and with the conflicting testimony the record discloses, we must reach the conclusion that Mr. Gray's consent was certainly a question for the jury to decide.

Judgment reversed, and verdict of the jury reinstated, and judgment thereon here entered for appellant.

Mr. Justice ROBERTS concurs in the result solely on the ground that the issue of consent was properly submitted to the jury.  Mr. Justice COHEN joins in this view.

Mr. Justice JONES and Mr. Justice EAGEN dissent.

————

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

This is an action of trespass for a battery, and not the usual action for malpractice.  The majority Opin-

ion admits that there was *no negligence* on the part of the defendant either in his surgical operation, or in his preoperative diagnosis, or in his postoperative care. Moreover, plaintiff signed a "consent to operation" agreement and admitted that he knew defendant was going to make an exploratory operation on his back.

Plaintiff bases, and the majority of this Court sustain, his right to recover damages on the alleged fact that *he did not understandingly consent to the serious operation which defendant performed* and for which, we repeat, plaintiff signed the "consent to operation" agreement. This "consent to operation" agreement is so broad and so clear and so unquestionably applicable to and inclusive of the operation which defendant performed, that it is impossible for me to understand how the majority can permit it to be evaded and nullified. It reads:

"ALLEGHENY GENERAL HOSPITAL

Pittsburgh, Pa.

CONSENT TO OPERATION, ADULT

"WHEREAS, I, /s/ Chas. B. Gray residing at No. Street,

(City and State)

and now in the Allegheny General Hospital of Pittsburgh, Pa.; and of full age, have been *informed by the physicians**of said hospital that in their opinion an operation on me is necessary for the proper treatment of my illness. I hereby consent to the same and said *physicians are hereby authorized to employ whatever operative procedure they deem necessary,* using their best skill and judgment.  .

---

* Italics throughout, ours.

"WITNESS, my hand and seal, at said hospital, in the City of Pittsburgh, Pennsylvania, this 18th day of Jan., A.D. 1960.

Attest:

/s/ _____

_____

/s/ Charles B. Gray  "

The majority sustain the jury's verdict not on the important question of what the written agreement covered, but on the oral testimony of plaintiff as to what he believed the defendant intended to do. The majority make the critical issue not what the doctor actually told the patient in advance of the operation but what the latter, a layman, *understood or should have understood* from what the surgeon said, in explaining what he contemplated doing.

Defendant relies upon plaintiff's written consent agreement which specifically authorizes the physicians of that hospital to perform "whatever operative procedures they deem necessary." *Plaintiff's own doctor,* Dr. John B. Blakley, *who brought defendant in to perform the operation,* testified that he had explained to plaintiff prior to the operation that the proposed operation was a serious one, and not as plaintiff claims only a minor one. Defendant also testified substantially to the same effect.

The trial Judge in his charge to the jury placed the issue (and realistically, the verdict) on this purely subjective basis: "Did the plaintiff consent to major or serious surgery, or *did he anticipate only minor surgery, and did he believe that there was practically nothing to this operation, as he testified; and that's the only issue in the case.* We know, of course, that

he did consent to an operation. The only question is did he consent to major surgery."

The decision by the majority of this Court opens wide the door (1) to fraud and (2) to the belief or understanding or guess of one party to "a consent agreement" as to exactly what it covered and meant and (3) most important of all, it amounts to an alteration and virtual nullification of a written instrument by parol evidence of defendant's (admittedly) nonfraudulent oral statements concerning the proposed operation. The admission of such parol evidence flies in the teeth of the long and well established law, which is applicable to written instruments, viz., in the absence of fraud, accident or mutual mistake, prior oral statements or oral understandings or inducements or agreements are merged in a subsequent written agreement.* *McWilliams v. McCabe,* 406 Pa. 644, 179 A. 2d 222; *United Refining Company v. Jenkins,* 410 Pa. 126, 189 A. 2d 574; *Smith v. Yohe and Gailey,* 412 Pa. 94, 194 A. 2d 167.

In *United Refining Company v. Jenkins,* 410 Pa., supra, the court said (page 134) : "The rule enunciated in Gianni v. Russell & Co., Inc., supra, is firmly embedded in the law of Pennsylvania and from that rule we will not permit a deviation for it is essential that the integrity of written contracts be maintained. In Grubb v. Rockey, 366 Pa. 592, 597, 79 A. 2d 255, we said: 'The modern Pennsylvania Parol Evidence Rule is well stated by Mr. Justice STEARNE in Walker v. Saricks, 360 Pa. 594, 598, 63 A. 2d 9: "This Court said in Gianni v. Russell & Co., Inc., 281 Pa. 320, 323, 126 A. 791: 'Where parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement: [citing cases]. *All*

---

* which, as here, contains the entire agreement of the parties.

*preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parol evidence:* [citing cases].' " ' See also: O'Brien et al. v. O'Brien, supra; Bokser v. Lewis, 383 Pa. 507, 119 A. 2d 67; Keleher v. LaSalle College, 394 Pa. 545, 147 A. 2d 835."

The trial in this case took place about five years after the questioned operation. Until surgeons open the human body, they cannot be sure of what conditions they will find, or determine in advance with certainty what surgical or operative procedures or other treatments are wise or necessary, or exactly what operation(s) they will perform when the actual conditions within the patient's body can be seen and more accurately diagnosed and determined. If the majority adhere to their new rule, malpractice and trespass claims will hereafter be made countless times, irrespective of what written consent or release is signed by a patient.

Plaintiff is not aided—in view of the aforesaid consent to operation agreement—either by his legally inadmissible and (in any event) legally insufficient testimony, or as he claims by defendant's testimony. Defendant, who has performed more than 4,000 major operations, when called as of cross-examination, testified that he always told a patient (especially a patient with a back condition) of the seriousness of and the risks involved in any operation on the back, but he could not remember the exact words he used to explain it to the plaintiff five years before. How could any doctor honestly remember *exactly* what he said to a particular patient five years before the trial? Plaintiff's signed written consent to whatever operation the physicians deem necessary should not be permitted to be repudiated by his oral testimony that *he thought an*

*exploratory operation was not a serious operation or indeed any operation at all.* The practical effect of the majority Opinion would require a surgeon to be not only (1) an able surgeon but also (2) a prophet, and (3) a highly technical lawyer, and (4) an insurer, or in the alternative, a perjurer—although realistically speaking, even perjury would rarely ever suffice to win a jury's verdict against a plaintiff-patient in a pitiful condition. To impose on a surgeon such a burdensome test is very unrealistic, very unfair, and very unjustifiable.

In *Smith v. Yohe and Gailey,* 412 Pa. 94, 194 A. 2d 167, the court, in affirming a compulsory nonsuit in plaintiff's action against Gailey, aptly said (pages 106, 107-108) :

"Smith v. Dr. Gailey

"A. Was An Unauthorized Operation Performed by Dr. Gailey?

"Smith charges that Dr. Gailey performed an unauthorized operation on (Mr. Smith) by inserting a Steinman Pin in his tibia.

"The principles of law applicable to this phase of the litigation are clear. Such principles are: (a) where a patient is mentally and physically able to consult about his condition, in the absence of an emergency, the consent of the patient is ' " 'a prerequisite to a surgical operation by his physician' " ' and an operation without the patient's consent is a technical assault (Moscicki v. Shor, 107 Pa. Superior Ct. 192, 195, 163 A. 341; Dicenzo v. Berg, 340 Pa. 305, 307, 16 A. 2d 15) ; (b) the burden is on plaintiff to prove 'that the operation performed, or substantially that operation, was not authorized by him': Dicenzo v. Berg, supra, 307.

. . .

" 'In the first place, when Mr. Smith first was admitted to the hospital, [Smith] signed the following statement which was admitted in evidence: "This is to

certify that I (we) the undersigned consent to any treatment or to the administration of whatever anesthetic and the performing of whatever operation or medical procedure deemed necessary or advisable in the diagnosis and treatment of this patient." This would seem to furnish a complete answer to [Smith's] claim of lack of authority.

" 'However, [Smith] infers that the conversation between him and [Dr. Gailey] prior to the questioned procedure constituted a withdrawal or limitation of the prior blanket authorization, and that [Dr. Gailey] then agreed to limitations which he thereafter exceeded: [Smith] described this conversation as follows: "I said, 'What is it with these manipulations? What are they like?' He said, 'Very painless; a little sodium pentothal and we pull the patient's limbs and try to snap his prosthesis back into place.' . . . I said, 'Is this all you are going to do, a manipulation?' And he said, 'Yes.' My brother and I looked at each other and said, 'We will go along with that.' "

" 'We fail to see that the insertion of the Steinman pin was a procedure exceeding any limitations [Smith] may have imposed. . . .' "

For each and all of these reasons I would affirm the judgment which was entered by the lower court, namely, judgment for defendant non obstante veredicto.